**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

**------------------------------------------------------------X   Case No. 18-07178-ENV**

**BOYSIN LORICK, CYNTHIA LORICK**

                                 **Plaintiffs,**

**v.**


**KILPATRICK TOWNSEND**
**AND STOCKTON LLP,**
**COLIN M. BERNARDINO,**
**KEITH BRANDOFINO, JOHN M. CHURCH**
**SUMIT JAIN**
**WATERSTONE ASSET MANAGEMENT**
**WELLS FARGO BANK NA**
**BERKADIA COMMERCIAL MORTGAGE,**

                                 **Defendants.**

          **------------------------------------------------------X**


## AMENDED COMPLAINT WITH JURY DEMAND

          Plaintiffs Boysin Lorick and Cynthia Lorick (Loricks) by and through

their attorney, Dahiya Law Offices, LLC for their Amended Complaint against

Defendants Kilpatrick Townsend and Stockton LLP, Colin M. Bernardino, Keith

Brandofino , John M. Church, Sumit Jain, Waterstone Asset Management LLC,

Wells Fargo Bank NA and Berkadia Commercial Mortgage (collectively the

"RICO Defendants) alleges as follows:

## NATURE OF THE CASE

***"Law that takes property from A. and gives it to B: It is against all reason and***
***justice."*** *(Calder v. Bull,* 3 U.S. 386, 388, 1 L. Ed. 648 (1798))

1.        This is a complaint bringing to the Court's attention painful victimization

of the Loricks, an elderly couple (in their late 70s) by the defendants manipulating

the mortgage servicing, the system, the courts and the judgments thereto to rob this

couple of their hard-earned lifelong savings. The defendant inequitably used legal doctrines to bury the real facts and successfully walked away with their loot. This case is a cry for fairness and justice. It is much more poignant as the defendant attorneys used illegal means to accomplish illegal acts but giving it appearance of legality. The defendants misled the courts and the Loricks. The defendant servicers improperly foreclosed on the real property of the Loricks as the regular loan servicing did not provide enough financial incentive for them. Both the servicers and the loan holders saw an opportunity here to make money, the loan holder getting full benefit of the loan and the loan servicer with its attendant legal costs and other servicing costs being fulfilled owing to the equity in the real property— the interest of both the loan holder and servicer aligned—the foreclosure trap was set and their Attorneys executed it with full knowledge of the falsity of the claims.

With the securitized loans, it is only with the defaulted loans that the servicers make their best monies.[1] And for the same, they would corner any borrower. Here they had the best opportunity. They arbitrarily imposed a maturity date to the loan with a resulting foreclosure and had their real property sold through the bankruptcy process which was a but a gold mine for the defendants, as the bankruptcy estate provides attorney's fees under the bankruptcy law, for those mortgagees with equity in the underlying bankruptcy estate real property.  The defendants sold the debtor Loricks real property awashed with equity. To reach this

---

[1] Levitin, Adam J. and Twomey, Tara, Mortgage Servicing (December 15, 2010). Yale Journal on Regulation, Vol. 28, No. 1, 2011

level, the defendants used all kind of unlawful acts including perjury, deceit, racketeering acts and worked together as an enterprise from 2012 until December 2018. It was indeed a loot for the defendants. But the Loricks are still waiting to be heard as the defendants with their enterprise misled both the state and bankruptcy court. The Loricks are not sophisticated people and nor did they have benefit of a competent litigation attorney in the state court.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Loricks' federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). This Court has supplemental jurisdiction over Loricks state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Loricks' claims occurred in this District.

## PARTIES

4.      Plaintiffs Boysin Lorick and Cynthia Lorick (Loricks) are residents of state of New Jersey.

5.      Defendant Kilpatrick Townsend and Stockton LLP (Kilpatrick) is a law firm operating from New York with branches in different part of the country, including Atlanta.

6.       Keith Brandofino (Brandofino) is a partner with Kilpatrick based in New York.

7.     Colin M. Bernardino (Bernardino) is a partner with Kilpatrick based in Atlanta and is very frequently involved in litigation in this district as a *pro hac* attorney with cases dealing in bankruptcy.

8.     John M. Church (Church) is the Chief Executive Officer of Waterstone Asset Management LLC with an office at 8720 Red Oak Boulevard, Suite 300, Charlotte, North Carolina 28217.

9.     Sumit Jain (Jain) is an Asset Manager of Waterstone Asset Management, LLC operating from 8720 Red Oak Boulevard, Suite 300, Charlotte, North Carolina 28217.

10.     Waterstone Asset Management LLC (Waterstone) is a North Carolina based company specializing in commercial loans servicing with a motto as declared by its CEO: "Our team of highly experienced asset management and servicing professionals are prepared to harvest the value of the loans and customers, using our unique processes to generate the highest return for the portfolio's investors." Waterstone was also a sub-special servicer to Berkadia on Sovereign Commercial Mortgage Securities Trust, Series 2007-C1; a $700 million portfolio of small commercial loans and it acted as the day to day servicer of the subject loan after the acquisition of the servicing rights from Berkadia Commercial Mortgage.

11.     Wells Fargo, N.A. (Wells Fargo) is a national bank dealing with mortgage loans with branches all over the United States. Fargo was the trustee ("Trustee") for the registered holders of Sovereign Commercial Mortgage Securities Trust 2007-C 1, Commercial Mortgage Pass-through Certificates, Series 2007-Cl. involved in this case.

12.     Berkadia Commercial Mortgage LLC (Berkadia) is a business entity with offices around the country including one at 323 Norristown Road, Suite 300 Ambler, PA 19002. Berkadia with its countrywide offices are primary, master and special servicers rendering administrative services in connection with securitization of the pool of loans.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

13.     Loricks owned a multifamily residential building real property located at 3126 Coney Island Avenue, Brooklyn, New York 11235 (the "Real Property"). On or about September 13, 2005, the Loricks refinanced the Property with Independence Community Bank ("Independence") creating a new indebtedness of $2,250,000.00 (the "Loan" or "Consolidated Note"). As collateral security for the payment of the Consolidated Note, Loricks executed, acknowledged and delivered to Independence the Mortgage on the Premises in the aggregate principal amount of $2,250,000.00.

14.     The Consolidated Note was set at an interest rate of 5.25% per annum and for default at 16%.  The Consolidated Note was payable in full by October 1, 2012. And the Consolidated Note, ¶ 48, granted the Loricks the option to renew the Loan. The renewal was automatic upon payment of 1% of unpaid principal balance with 60 days advance notice.   The renewal would extend the maturity date of the loan by five years.

15.     When the loan was provided in 2005, the lender had escrowed $25,000 in their escrow account to make sure that the Loricks repair the roof of the Property. Around 2010, the repair project was completed. Mr. Lorick sent them an affidavit

that the roof repair was completed as per their requirement. The lender still had the escrowed $25,000 with them.  In and around July 2012, Mr. Lorick sent them a handwritten letter for the renewal of the loan followed up by telephonic conversation with a woman in charge of loan at Berkadia. Mr. Lorick spoke to her regarding renewal of the loan term.  He was assured that the loan was current and they would apply the $20,000 escrowed money as 1% of the amount needed to renew the loan.  The Loricks still had an extra $5000 in the lender's escrow account. Around late 2011, Waterstones had purchased the primary and special servicing rights to some securitized portfolio of commercial loans from Berkadia. Berkadia continued to play its part as Master Servicer for the portfolio. As part of this acquisition, Waterstone established an office in Atlanta with the team of employees transferred from Berkadia. Waterstone had complete information and paperwork regarding the entire loan history and mortgage payments.

16.    Under the impression that the Loan had been renewed, as was confirmed by Berkadia's woman employee working Loricks kept sending regular payments of $17,290.39 from their Wachovia bank account.

i.    On September 6, 2012, the Loricks mailed a check (#4075) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

ii.    On October 7, 2012, the Loricks mailed check (#4086) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

iii.    On November 10, 2012, the Loricks mailed check (#4083) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

iv.     On December 10, 2012, the Loricks mailed check (#4090) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

v.     On January 10, 2013, the Loricks mailed check (#4094) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

vi.     On February 9, 2013, the Loricks mailed check (#4107) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

vii.     On March 9, 2013, the Loricks mailed check (#4117) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

viii.     On April 9, 2013, the Loricks mailed check (#4123) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

ix.     On May 7, 2013, the Loricks mailed check (#4134) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

x.     On June 10, 2013, the Loricks mailed check (#4145) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

xi.     On July 10, 2013, the Loricks mailed check (#4151) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

xii.     On August 10, 2013, the Loricks mailed check (#4162) of $17,290.39 duly cashed by the servicer Berkadia. Ex. A.

xiii.     Around second week of September and October of 2013, the Loricks duly paid the regular mortgage amounts of $17,290.39. Ex. A.

xiv.     Around second week of November of 2013, the Loricks again made a payment of $17290.39. Ex A.

7

17.     However, despite assuring the loan renewal, the servicers Waterstone in 2012 accelerated the entire loan and demanded full payment of the principal balance. After the arbitrarily imposed maturity of the loan in 2012, Berkadia and Waterstone continued to collect more than $207,484.68 as installment payments under the loan renewal scheme.  The Loricks were current with their payments. However, the servicer, Berkadia and sub-servicer Waterstone had a different design. It is not exotic science to understand that the servicers gain more from a foreclosure of the asset than by mere servicing. The target was ripe, and the Real Property was awashed with equity, Berkadia and Waterstone could not have found a better time and target.

18.     The team of Berkadia that which was managing the account had changed. The Loricks received a letter from the servicer that all the loan amount is due. Mr. Lorick immediately got in touch with one Jain, the asset manager of Waterstone. Mr. Lorick prayed for the continuation of the loan, as he exercised his right to renew, but Jain insisted that all the amount was to be paid at once.

19.     On January 30, 2013, Berkadia as servicer for Fargo, through Kilpatrick commenced the foreclosure proceeding with the Kings County Supreme Court, Index No.  500469/2013, by filing a copy of the summons and complaint through New York state court established electronic case filing system and asked for appointment of a receiver.

20.     Upon information and belief, John M. Church the CEO of Waterstone as a Sub-Special servicer of Berkadia had hired Kilpatrick through their attorney, Bernardino, to prosecute this foreclosure proceeding, who in turn engaged services

of New York based Brandofino, as Bernardino does not possess a New York state attorney license.

21.    In the filed state court foreclosure action, the defendants including their attorneys, Kilpatrick did not disclose that the plaintiffs had renewed their loan and that the plaintiffs  were not in default, rather Waterstone and its counselors made the following false statements to mislead the state court and snap contractual rights of the Loricks:

> Borrowers [Plaintiffs]defaulted under the terms of the Consolidated Note and Consolidated Mortgage by failing, inter alia, to make payment in full when due on the Maturity Date [October 1, 2012], and said default continues to the date hereof.
>
> The amount due and owing as of October 1, 2012 is principal in the outstanding amount of $1,992,410.85, plus accrued and unpaid interest, continuing to accrue at the default rate of interest as provided in the Consolidated Note, late charges and other charges pursuant to the Consolidated Note and Consolidated Mortgage to the date of entry of foreclosure judgment herein, plus reasonable attorneys' fees, costs and expenses.

22.    The trustee of the loan, Wells Fargo and the services of the loans, Berkadia and Waterstone and its attorneys knew that the filed foreclosure complaint was deceptive and meant to mislead the state court, thereby causing damage to the plaintiff's equity in the Real Property. The said defendants suppressed the fact that the Loricks had exercised the option of loan renewal and thus the loan could not have been accelerated nor default rates imposed upon them.

23.     In furtherance of their goal, suppressing the fact of loan renewal, Mr. Jain, the Asset Manager of Waterstone, filed a perjurious affidavit in support of an appointment of a receiver in the state court action regarding acceleration of the loan and the alleged default by the Loricks. Mr. Jain knew that the said statements were

perjuious and calculatedly made to achieve an unlawful result, foreclosure of the Real Property and claiming of a default interest rate, when in fact they were not entitled to have the same.

24.     Mr. Lorick shocked with what had happened hired an attorney and meanwhile Mr. Lorick was told that the Bank had agreed to stop foreclosure in case he came up with the unpaid balance of the Loan, which at that point had not exceeded 1.992m. Loricks went from place to place and finally had the commitment from a lender to pay off the mortgage.  But not wanting to lose the Property, Mr. Lorick went around the market to get a loan to pay off the unpaid principal balance. However, as soon as he took the offer, the commitment to Brandofino, he was told that Kilpatrick was owed a sum of $500,000 in attorney's fees. That started the pillage of the equity of the Property and dispossession of Loricks from their Real Property.  The Loricks had the fund to pay off the unpaid principal balance, but he could not timely come up with $500,000 falsely inflated attorney fees and late charges. Kilpatrick knew that pay off would divest them of attorney fees harvest. Kilpatrick also knew that that since the Property had enormous equity, they could harvest it. Kilpatrick also knew by that time that Loricks could not or would not be able to come up with the attorney's fees. They implemented their scheme; foreclosure would be more lucrative to their firm and client, the servicers and loan trustee than the loan renewal or redemption. Kilpatrick knew that the legal fees and late charges of $500,000 was a false amount and that the real number for the attorney's fees at the number was way less than that, as also something that would be unraveled by the latter filed state court paperwork. However, Berkadia and Fargo

would have to forgo the interest payment at 16% if there was pay off or settlement, which they would easily get if they take the case through the judgment.  The defendants conspired and joined hands to maximize their returns by pushing the Real Property through foreclosure and dismissing any pleas of refinancing or pay off.

25.     Brandifino and Kilpatrick knew that at the time of the commencement of the foreclosure proceeding, their fees could not have been $500,000.  However, that the target Real Property had enough to bring in monies for their firm Kilpatrick and pay handsome amount to their Partners billing rates. Mr. Lorick pleaded, however that did not serve Kilpatrick interests and Brandofino ambitions.  Loricks could not talk to the servicer, for they were represented by Kilpatrick.

26.     On or about July 22, 2013, Mr. Jain, the Asset Manager of Waterstone, the Sub-Special servicer for Fargo in furtherance of their scheme to foreclose on the property and suppressing material fact of loan renewal, filed a perjurious affidavit in the state court in support of summary judgment. Mr. Jain made the following false statement to mislead the state court,

> 15. Borrowers defaulted on their obligations under the Consolidated Note and Consolidated Mo1tgage by, inter alia, failing to pay the Loan in full on the Maturity Date (the "Default").
> 16. By Notice of Default and Demand for Payment dated October 26, 2012 (the "Notice"), Trustee, through its counsel, notified Borrowers, among others, of the Default and demanded payment within fifteen (15) days of the date of the Notice, no part of which has been paid despite demand.
> 17. Borrowers nonetheless failed to cure the Default. As a result, Trustee commenced this action.
> 18. As a result of the foregoing, there is now due and owing by Borrowers to Trustee, pursuant to the Consolidated Note and Consolidated Mo1tgage, the

11

> unpaid principal in the amount of $1,992,410.85, accrued and unpaid interest at the rates set forth in the Consolidated Note through and including July 14, 2013 in the amount of $260,203.32, accrued and unpaid late charges through and including July 14, 2013 in the amount of $100,056.38, together with such additional late payment charges, advances and Trustee's costs and expenses of collection, including, without limitation, Trustee's reasonable attorneys' fees and costs.

Sumit Jain Affidavit in the State Court, dated July 18th, 2013 mailed from North Carolina. Jain knew that the aforesaid statements were in fact false and perjurious, as Mr. Lorick had reminded him of the renewal and his continuous payments to them. Mr. Jain knew that the Loricks had not defaulted. Jain further had the knowledge of renewal fees of 1% was paid, as it was in their escrow account. Mr. Jain knew that Loricks had made additional sum of $17,290.39 every month for an additional year. Despite such knowledge and facts, Jain submitted the false affidavit as a part of the enterprise to raise monies for his company and to assist the defendants in their enterprise's motive.

27.     Prior to the summary judgment motion by the defendants, Mr. Jain under instructions from Mr. Church had once before mailed another perjurious affidavit dated January 29, 2013, for the appointment of the receiver. Mr. Jain in this affidavit claimed that,

> 21. Borrower defaulted on its obligations under the Consolidated Note and Consolidated Mortgage by, inter alia, failing to make payment of the Loan in full on the Maturity Date, October 1, 2012 and continuing to date (the "Default").
> 22. By Notice of Default and Demand for Payment dated November 2, 2012, Trustee, through its counsel, notified Borrower, among others, of the Default and demanded payment by November 17, 2012, no part of which has been paid despite demand.
> 23. As a result of the foregoing, there is now due and owing by Borrower to Trustee, pursuant to the

12

> Consolidated Note and Consolidated Mortgage, the unpaid principal in the amount of $1,992,410.85, together with accrued and unpaid interest at the rates set forth in the Note, accrued and unpaid late charges, together with such additional late payment charges, advances and Trustee's costs and expenses of collection, including, without limitation, Trustee's reasonable attorneys' fees and costs.
>
> 24. As a result of the foregoing, Trustee respectfully requests the appointment of a temporary receiver of the Premises forthwith.

Mr. Jain Affidavit in support of a Receiver under instruction from Kilpatrick and Mr. Church. Mr. Jain and Kilpatrick knew that what he had mailed to Kilpatrick to filed in the state court was in fact a false sworn statement. The fact was that the Loricks were current with their payments, also that the Loricks had continued to make regular payments despite the claim that "no part of which has been paid despite demanded." Also, that unpaid principal demanded here was a false amount, the fact of payment of additional sum of $17,290.39 every month for additional year was not shared with the court.

28.     Brandofino similarly filed via electronic means, false statements in the state court foreclosure action. Brandofino falsely claimed that the Loricks had defaulted on their loans when he commenced the foreclosure action, filed an application for receiver, filed for summary judgment and moved to establish the final judgment amount for court approval.

29. Brandofino on or about August 14, 2013, files electronically, Statement of Material Facts in support of the motion for summary judgment with the State Court misleading the state court, to wit: Borrowers defaulted on their obligations under the Consolidated Note and Consolidated Mortgage by, inter alia, failing to pay the Loan in full on the Maturity Date. Brandofino knew the statement submitted to the

court was false and in fact Borrowers had not defaulted. Further, Brandofino in furtherance of the scheme of loot, suppressed the material fact that the Borrowers/Loricks had actually renewed the loan for an additional 5 year's time.

30.     In the foreclosure Complaint, Berkadia claimed that "[t]amount due and owing as of October 1, 2012 is principal in the outstanding amount of $1,992,410.85." State Complaint. The Loricks were current with the payments.

31.     On or about January 7, 2014, the defendants through Kilpatrick filed electronically with the state court a proposed Final Judgment of Foreclosure with the following numbers:

| | |
|---|---|
| Unpaid Principal Balance | $1,992,410.85 |
| Accrued and Unpaid Contract Interest Through and Including October 14, 2013 | $125,812.46 |
| Accrued and Unpaid Default Interest Through and Including October 14, 2013 | $239,768.88 |
| Accrued and Unpaid Late Charges | $100,056.38 |
| Servicer Administrative Fees | $300.00 |
| Interest on Advances | $2,499.34 |
| Property Protection Advances | $375.00 |
| Outstanding Escrow Advances | $1,855.75 |
| Appraisal | $5,000.00 |
| Attorneys' Fees and Costs through execution of Settlement Agreement | $74,816.50 |
| *Subtotal* | *$2,542,895.16* |
| Credit for Escrow Funds on Deposit | $95,773.56 |
| Total | **$2,447,121.60** |

32.     The Defendants and Kilpatrick falsely claimed $2,447,121.60 as amount due with full knowledge that the loan was on a renewal period and the applied default rate was incorrect. Also, the amount $207,484.68 was not applied towards

14

reduction of the principal. Without the credit being applied, the defendants had the benefit of additional revenues in terms of the additional default interest as well plain usurpation of $207,484.68.

33.     On or about February 21, 2014, the state court entered a judgment against the Loricks for a sum of $2,447,121.60, with the "interest rate set forth in the loan documents from October 15, 2013, to the date hereof, and the interest at the legal rate thereafter."   The defendants knew that the proposed judgment had false amounts posited by them and also that the default rate of interest was equally improper, as the Loricks had not defaulted.

34.     On or about March 7, 2014, Brandofino and Kilpatrick through electronic means filed a notice of entry of the judgment of foreclosure and mailed a copy of the same to the attorneys, which they knew had fraudulent numbers as to the amount of monies owed and for bringing a foreclosure action without default and also applying default rate [without a default] of interest on the loan amount.

35.     On June 3, 2016 based on the representation of the false numbers by the defendants, state court amended its final judgment of foreclosure and increased the amount owed to $3,668,619.69.[2] The defendants knew that this sum did not included the additional payments that the defendants had received and not applied. Also, the default rate was applied fraudulently as the plaintiffs were not in default at the commencement of the foreclosure.

---

[2] This Amended Judgment of Foreclosure fixed $85,000 as the sum including attorney fees, mortgage advances, taxes etc. (It is no where near $500,000 as was initially claimed by Brandofino for payoff)

36.     After having obtained the judgment of foreclosure based on the false figures and statements, the defendants put the Real Property for a foreclosure sale.  In order to avoid the loss, the Loricks sought refuge in the bankruptcy court on December 15, 2016.

37.     Brandofino role as the lead counsel role was never taken over by Bernardino on or by December 21, 2006, Bernardino flew in from Atlanta to prosecute the defendants' judgment foreclosure and applied *pro hac vice* admission with the bankruptcy court of this district.

38.     On or April 24, 2017, Bernardino filed a Proof of Claim, signed by John M. Church, CEO of the Waterstone, with the bankruptcy court in the bankruptcy estate of the Loricks.  Bernardino and Church demanded a sum of $4,149,568.83 from the Loricks' estate with full knowledge that the amount of claim filed was false and did not reflect the real numbers.  This $4,149,568.83 claim did not apply the sums paid after the defendants' unilaterally changed maturity date of the Loan. The estate of Loricks became a gold mine for the defendants. When the bankruptcy judge was informed that the defendants filed claims were false and improperly, she said that she was helpless as she was bound by the state court judgment. The defendants, however, knew the falsity of their claims, they persisted in claiming and picking up large sums of monies devouring any vestige of debtors' equity in the Real Property. Bernardino brought immense pressure upon the bankruptcy court for the sale of Property and challenged any steps taken by the plaintiff to refinance the real Properties.

39.     After the bankruptcy filing, Bernardino filed a series of paperwork, including continuation of the receiver, lifting of the stay, dismissal of the case, appointment of the trustee, based on the state court judgment amounts, which Bernardino knew was based on fraudulent numbers and  as well as by procured by misleading the state court about the default and default interest rate.  The Property was finally sold in an auction conducted in the bankruptcy court, which itself became a source of a very expensive litigation solely owing to improper rejection of the highest bidder by Bernardino.[3]  Thus, the Loricks' Property worth more than $12m was sold for 7.3m all because the defendants wanted it to be sold.

40.     On December 4, 2017 Bernardino moved the bankruptcy court for payments from the sale proceeds.  Bernardino claimed a sum of $5,220,520.12 owed to them and his clients and other defendants.  This application did not reflect the payments that the defendants had received. Bernardino knew about it and pushed in for payments based on inflated and false numbers. The claimed amount reflected a default interest rate when in fact that the Loricks had not defaulted. All the defendants knew about the amounts claimed by them was false and fraudulent. However, they pressed on with these motions and application, as they had the judgment of foreclosure, which they knew was improperly commenced and judgment was obtained by misleading the court. The bankruptcy court under the

---

[3] Mohammad Choudhary was the highest bidder on the Property sale at $7.4million, however owing to pressure from Bernardino, the Property was sold to the second highest bidder Soleyman Ghalchi. This resulted in the extensive litigation incurring huge loss to the estate. Adversary Case 17-01153-nhl (bankruptcy court), *Choudhary v. Bernardino* et al 2017-cv-07195 (EDNY) (Now ono appeal to second circuit); *Ghalchi v. Lorick eet al,* 2017-cv- 05641 (EDNY) and other related appeals. Bernardino became a sole cause to these lawsuits.  The Court is requested to take a judicial notice of the same.

impression and bound by the state court judgment granted the claimed amount to the defendants, an amount that the defendants knew that they were not entitled to.

41.     On February 8, 2018, Bernardino and the defendants filed through electronic case filing, another supplemental application with the bankruptcy court reiterating the same false amount debt which they knew did not reflect the payments that they had received from the Loricks. On April 9, 2018, the defendants yet filed other applications for the payment of the sums which were fraudulently inflated. On June 28, 2018, Bernardino filed yet another application for the payments as per earlier filed proof of claim as well as enormous amount as attorneys fees, based on the state court judgment which was,  they knew had their misrepresented amount and not the true amount which they had knowledge about. Based on their misrepresented numbers the bankruptcy court on August 9, 2018 granted their fraudulent claims in full.

42.     On June 8, 2018, the undersigned sent an email to the defendants about the additional payments made by the Loricks which were not given credit and or considered and not reflected in proceeding state or the bankruptcy court:

> Sent: Friday, June 08, 2018 10:07 AM
> To: Bernardino, Colin
> <CBernardino@kilpatricktownsend.com>; Brandofino, Keith
> <KBrandofino@kilpatricktownsend.com>
> Subject: I have not heard from you regarding my query
>
> Mr. Bernardino and Brandofino, I did not hear from you
> guys about servicing record of this loan.  Nor have you
> given any clarification about the monies that you took and
> did not disclose in the state proceeding and as well as in
> the bankruptcy proceeding.  Do you want us to bring
> plenary proceeding, issue subpoena and press mail and wire
> fraud?  Also, our objection to your claim to disbursement
> is still pending. I know it gets expensive for my client,
> as you would just bill my client even for your responses.
> This is my last request. Once again the letter is
> attached.

18

```
Thank you for your consideration.
Sincerely,
Karamvir Dahiya
```

Mr. Benardino responded:

```
Mr. Dahiya-

At the hearing, you promised that you would provide
us with the evidence substantiating your allegations.
We have not received that.

Also, are you alleging that I was involved in state
court proceedings?  Please confirm your facts before
you make these allegations.

Colin Bernardino
Kilpatrick Townsend & Stockton LLP
```

The undersigned responded (in bold letters),

```
On 6/8/2018 10:29 AM, Bernardino, Colin wrote:

Mr. Dahiya-

At the hearing, you promised that you would provide
us with the evidence substantiating your
allegations.  We have not received that.
```

**Sir, I need the servicing record, since the time you
started servicing loan.  You need to check your
records, because you maintained an account. You are
asking us to produce proof!**

```
Also, are you alleging that I was involved in state
court proceedings?  Please confirm your facts before
you make these allegations.
```

**Keith was involved with the state court. You and
Keith are partners.**

Bernardino Responds,

```
Your client stipulated to the claim and, separately,
a judgment was entered.  That matter was resolved
before the bankruptcy filing.  If you have
information to the contrary, you need to show
it.  You said you had evidence.  What is your
hesitancy in providing it?  On the other hand, I am
not aware of any facts to suggest the judgment is
improper.
```

**Colin Bernardino**
**Kilpatrick Townsend & Stockton LLP**

Suite 2800 | 1100 Peachtree Street NE | Atlanta,
GA  30309-4528

Undersigned response,

> There was no stipulation, yes there was a fraud.
> Signs were obtained on blank pages. And words written
> thereafter. You know that--haven't we said it in
> ample words?  Numbers are bad. There is no claim
> preclusion regarding fraud. Cannot hide behind state
> judgment. You must provide us servicing record
> how and what you received and how you applied.  I
> know I will provide something your clients would
> cook. I have done lot of these cases, i know how they
> operate.  Please provide us the servicing record of
> this loan since the time your client took over. It is
> not difficult, you had it for a short time. It is not
> running in years. Please provide us your client
> record of receipt of monies and how it was
> applied.  My client was current and kept making
> payments even after the acceleration. And your client
> kept taking the money. Yet the complaint and the
> summary judgment did not reflect that excessive
> payment.  We need an accounting of that monies

Brendafino attempted to bury the issue,

> Karamvir  -  If the claim is that your clients made
> payments that were not applied, then show us proof of
> such payments.  As far as the state court
> proceeding, your client was represented by multiple
> counsel.  After your client consented to the amount
> due by stipulation, the court appointed a referee to
> ascertain and compute the amount due.  On March 23,
> 2016, the court-appointed referee issued a report by
> which he independently computed the amount due to the
> lender.  This amount was confirmed by the state court
> after motion practice through which the court heard
> your clients' position.  To suggest that a fraud was
> committed is to suggest that it was done by the state
> court and the court-appointed referee.  I trust that
> you are not suggesting this.
>
>  Also, your clients previously filed an appeal in
> December 2014 and because they (or their counsel)
> neglected to perfect their appeal, the Appellate
> Division dismissed the appeal.  At this point, your
> clients' ability to appeal any of the state court
> orders has long passed.  To the extent that you
> believe your clients were wronged, then you ought to

20

look for relief elsewhere.  If your clients insist on
asserting frivolous claims against our clients, we
will be left with no alternative but to continue to
defend such allegations and seek the costs of doing
so from the funds that remain after the sale of 3126
Coney Island.  In light of the foregoing, I hope that
you will counsel your clients to not further waste
their own assets.

 Keith Brandofino
Kilpatrick Townsend & Stockton LLP

The undersigned continued to insist,

> **Subject** Re: I have not heard from you regarding my
>  :query
> **Date:** Thu, 21 Jun 2018 12:23:38 -0400
> **From:** KARAMVIR DAHIYA <karam@legalpundit.com>
>  **To:** Bernardino, Colin
>  Bernardino@kilpatricktownsend.com>
>  **CC:**          Brandofino, Keith
>  <KBrandofino@kilpatricktownsend.co
>  m>

Sirs, I have not received any record of the servicing
record regarding my clients loan. You have a ready
access to verify the amounts received. The amount of
monies sent is substantial even after the so called
arbitrary  and capricious acceleration.  Sir, we mean
it. We need the record. Should we produce the record
from our side, we will commence a plenary proceeding
against your clients both to vacate of the state
court judgment and as well as a federal proceeding
for conversion, racketeering. In good faith, we have
requested you to check your records, and immediately
give us  credit at 16% interest rate for the monies
paid (for that is interest used by your client).  We
will wait until June 28 for such credit.  Thank you
for your consideration.
Sincerely,
Karam

Bernardino responded,

> **Subject:**       RE: I have not heard from you regarding
>  my query
> **Date:**          Thu, 21 Jun 2018 16:51:43 +0000
> **From:**          Bernardino, Colin
>  <CBernardino@kilpatricktownsend.com>
>  **To:**           KARAMVIR DAHIYA <karam@legalpundit.com>
>  **CC:**           Brandofino, Keith
>  <KBrandofino@kilpatricktownsend.com>

What makes you sure that monies were received that were
not credited?

21

Colin Bernardino
Kilpatrick Townsend & Stockton LLP
Suite 2800 | 1100 Peachtree Street NE | Atlanta,
GA  30309-4528

The Undersigned responded,

| | |
|---|---|
| **Subject:** | Re: I have not heard from you regarding my query |
| **Date:** | Fri, 22 Jun 2018 02:43:37 -0400 |
| **From:** | KARAMVIR DAHIYA <karam@legalpundit.com> |
| **To:** | Bernardino, Colin <CBernardino@kilpatricktownsend.com> |
| **CC:** | Brandofino, Keith <KBrandofino@kilpatricktownsend.com> |

Sir if you have credited produce the servicing record.
Sir, please produce the servicing record. Not sure how
you have credited?  The numbers were fixed in the
complaint and the judgment obtained thereto. So please
once again I request you to Kindly produce the record.
I am sure, I have seen how records are created by
Servicers playing numbers and moving them with
fluidity to accommodate designs and perverse
allocations.  If you are clear and honest, what is the
reason for not producing the record.  Thank you for
taking out time.
KD

The undersigned trying best to resolve to the issue, pressed further,

**From:** KARAMVIR DAHIYA <karam@legalpundit.com>
**Sent:** Friday, June 29, 2018 8:06 AM
**To:** Bernardino, Colin
<CBernardino@kilpatricktownsend.com>; Brandofino,
Keith <KBrandofino@kilpatricktownsend.com>
**Subject:** [SUSPECTED SPAM] About adjustment/crediting
payment exceeding 200,000

 Counselors, you made a statement in the court that
the amount was adjusted by the referee in the state
court judgment. I do not see. Please advise and show
me where, so that we do not move forward with our
plenary action.  Thank you for your consideration.

 *Regards,*

Karamvir Dahiya

43.    The copies of the checks were sent to the Bernardino and Brandofino,

there was no further response regarding the application of the monies.  The Real

22

Property has been sold solely owing to manipulation and misrepresentation of the defendants.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Violations of RICO, 18 U.S.C. § 1962(c))**
**(Against All RICO Defendants)**

44.     The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

45.      At all relevant times, the Loricks are persons within the meaning of 18 U.S.C.§§ 1961(3) and 1962(c).

46.     At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

47.     These RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, which they did, as described in the foregoing paragraphs of this Complaint; namely, through a multi-faceted filings in the state and bankruptcy courts,  of lies, fraud, threats, to coerce the Loricks to part with their monies.  The defendants improperly called off their mortgage and defaulted the Loricks when in fact the Loricks had exercised their option to renew the loan.  The foreclosure was commenced by mispresenting the true facts. Even after the improper default, when Mr. Lorick came up with the necessary funds to pay off the unpaid principal, he was deliberately misled by Kilpatrick that the funds were not enough as their law firm had a bill exceeding $500,000, which Kilpatrick and its agent knew was a lie. Even after the foreclosure proceeding, the defendant deliberately concealed the

payments which they had received from the Loricks, thereby resulting in a substantial increase in the indebtedness and resulting interest. The defendants used mail and wire fraud and violated Hobbs Act to execute their scheme and filings in the respective courts including state and the bankruptcy courts. They knew that the statements contained in the filings with both the state and bankruptcy courts were fraudulent and misleading and did not disclose the real liabilities. Each defendant had knowledge of each other acts and each of them participated in the running the enterprise of extortion.

48.    The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961 (4) and l 962(c), referred to hereinafter as the "Enterprise." Each of the RICO Defendants participated as delineated above in the operation or management of the Enterprise.

49.    At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U .S.C. § 1962( c), for the Enterprise operated cross state lines and moved monies around across state lines for the conduct of the affairs of the enterprise.

50.    This Enterprise had a separate structure distinct from the mentioned pattern of racketeering activities, *infra*.  This Enterprise had three characteristics: 1) a purpose, (2) relationships among the defendants as associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. This Enterprise continued as a unit functioning with a common purpose of liquidation of the Real Property and maximum recovery applying fraudulent and deceptive means using false figures about the loan arrearage and suppressing

24

additional payments which resulted in serious damages to the property rights.  Each defendant had profits trickling from the ill-gotten gains. The defendants forged a relationship with each other and it continued from the unilateral declaration of loan default in 2012 until the final sale of the Real Property in Bankruptcy Court and making the final fees application with the bankruptcy court in 2018. The defendants bolstered and supported each other's positions by filing false and misleading pleadings, motions and papers with state and bankruptcy court.  Mr. Church, individually and as head of Waterstones instructed Jain and Kilpatrick for the results he wanted and Kilpatrick prepared the papers for filing with the state and bankruptcy courts according to their mutually agreed goal of maximizing their profits by deceptive means. Mr. Church not only supported the Enterprise acts, he flew in from out of states to come to the bankruptcy court twice to testify and support the attorney fees for Kilpatrick, to meet goal of one part of the Enterprise team—Kilpatrick's profits.  The loan trustee, Fargo agreed and coordinated in the defendants' unlawful conduct as it was expecting its own share of profits and loan closure.  Had Well Fargo not agreed to the scheme, the loan term would have been extended to another 5 years thus delaying the loan closure and loss of default rates as profits on the loan. All the defendants participated directly and indirectly in the conduct of the association in fact enterprise's affairs through a pattern of racketeering activity. And the complained of RICO defendants who were conducting and actively participating the affairs of the "Enterprise" were distinct from the Enterprise participating in, or managing aspects of, the Enterprise's

affairs. The Loricks suffered a serious loss of their investment and property owing to the deceptive means of carrying out the aforesaid affairs of the Enterprise

### Pattern of Racketeering Activity

51.     The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5) and in violation of 18 U.S.C. § l 962(c), to wit:

### Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act, 18 USC § 1951

52.     These RICO Defendants and their coconspirators organized their operation into a cohesive group with specific and assigned responsibilities and a command structure operating from North Carolina, Atlanta and New York, funded primarily from the mortgage servicing including foreclosure action. Though they operated from different places  and offered different services, they had one target among others, that is immediate liquidation of the  Property and repayment of the loan with lucrative benefits, including attorneys fees, defaulted interest rate payments, even if it was to be accomplished by unfair and illegal means.

53.     At all times material to this Complaint, the Enterprise was engaged in interstate commerce and in an industry that affects interstate and foreign commerce, with the loan securitized and payments being sent and received across the state lines and parties engaged in the pursuit in the collection of the loans and the affairs of the Enterprise managed through telephones, wires, mailing across the state lines.

54.     As described herein, the RICO Defendants had created a false impression

based on false and misleading statements, threatened the Loricks to come up with $500,000 in attorney's fees to make it impossible for the Loricks to reinstate the mortgage or pay off the liability and start with a new lender.   And besides misrepresenting the true facts regarding loan defaults demanded funds which they were not entitled. They had the funds with them which they did not apply, rather billed the Loricks with very inequitable charges and attorneys' fees.  The RICO defendants used wrongful means to achieve a wrongful objective. The defendants knew when they demanded $500,000 in attorneys fees from the Loricks, that was not proper sum due and that they further knew that Loricks would not be able to come up with that sum. The RICO Defendants had no lawful claim over the demanded $500,000 in attorney's fees for allowing a pay off the loan. The Loricks could not come up with the demanded monies and hence could not redeem the property from foreclosure process. However the deceptive means of the RICO defendants did not stop there. They used every unlawful means to inflate the liability, including not applying sums received to reduce the principal sum, improperly keeping the monies in the escrow reserve serving no purpose, other than artificially increasing the interest accretions on the unpaid liability.  Not doubt, the defendants did not have immediate right to the loan amount as the loan was on an automatic renewal time when the Defendants improperly defaulted the Loricks and put them in the state foreclosure proceeding. The Defendants also were not entitled to the monies they derived from the filings in the state and bankruptcy court. Had they properly applied the additional sum of $207,484.68 at the time of its receipt, the loan would have been significantly reduced and this would have enabled the

Loricks to arrange for another lender to payoff timely thus saving their Property exceeding 12m in value, which had a fire sale of $7.3m. The means used by the defendants to receive what they received from the bankruptcy court was inherently deceptive and wrongful.

55.     Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected-and attempted to obstruct, delay, and affect---commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted  and successfully obtained the Loricks to  relinquish their Property through the wrongful use of actual and threatened force and fear-including fear of economic harm with the fraudulent civil judgment.

***Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343***

56.     As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud the Loricks, the state and the bankruptcy courts by misrepresenting the facts, concealing their real designs and background using the simplicity of the Loricks to their advantage.

57.     In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and also caused matters and   things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

28

a. numerous emails and filing false and misleading papers with the state and bankruptcy court;

b. wirings and/or mailings between and among the RICO Defendants concerning the preparations of the complaint, motions, applications, claims filed and submitted to the state and bankruptcy court;

c. communications directed toward state and federal courts and including U.S. Trustee's offices incorporating false and misleading statements as delineated above.

d. funds transferred by the Law Offices of Norma Ortiz to the RICO Defendants in satisfaction of a fraudulent filed claim and misrepresented numbers;

d. emails and over state lines communication between Church and defendant attorneys about sharing of the profits and thus accordingly consensually filing fraudulent papers with the courts. All this was done with the intent that those acts and funds be used to promote the carrying out of the RICO Defendants' criminal activities; and,

e. electronic filing and service of court papers in the state court action (NY Kings County Supreme Court, Index No. 500469/2013) and in the bankruptcy court (EDNY case no. 16-45645) containing false and misleading statements intended to achieve unlawful results and gains to which the defendants were not entitled to.

58.    The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud the Loricks into paying the RICO Defendants and their co-conspirators. The RICO Defendants knowingly and intentionally prepared a self-serving claims of alleged liability of the Loricks, and then knowingly and with the intent to deceive the state and bankruptcy court caused those claims to be filed under the pretense that it was the proper claim amount of the monies owed and properly invoked default.  The RICO

Defendants conspired with each other's into filing these false claims and statements in the court, which the RICO Defendants knew to be false or misleading.

Kilaptrick, Brandofino and Bernandino knowingly facilitated the activities of the other defendants and the other knowingly supported and participated in the manner of prosecution of the foreclosure action and their acts within the bankruptcy court forum. The defendants knew about each others role and actively supported it by preparing, signing papers in both courts and state and bankruptcy and filing such documents and making such statements as detailed above, which were in fact deceptive and misleading. Kilpatrick and its legal team representation of the other defendants exceeded standard legal representation, as they had full knowledge, as they had to them available the entire loan file and thus they knew the falsity of the claimed alleged default by the Loricks and loan arrears. It was a joint operation, with each defendant actively supporting the fraudulent means of the obtaining the foreclosure of property and misleading the courts about the real arrearages. Kilpatrick not to lose extra fees and profits for themselves and other defendants made extortionist demands of $500,000 in addition to the monies demanded in the complaint to pay off the entire loan despite full knowledge such an $500,000 was not the right figure and it was done solely to defeat Lorick desire to pay off the figure, which would have cut off the profits supply line of hourly billings and default interest rates. Kilpatrick actively engaged in the directing the affairs of the Enterprise—they were the knowing tools of racketeering means employed by the other defendants to achieve the Enterprise illegal results. Each defendant shared the final loot of liquidation of the Real Property and subsequent disbursement of cash

by the bankruptcy court.  The tools used and means employed by the Defendants including predicate acts of mail  and wire frauds resulted in loss of monies and investment to the Loricks.

59.     The RICO Defendants' false and misleading statements have been relied on by the New York state court, U.S. Bankruptcy Court and the appellate courts, U.S. Trustee office, by means of its acceptance of Defendants' misrepresentations and omissions and its failure to take meaningful corrective action even after it was brought to their attention.   Thus, the RICO Defendants' false and misleading statements by multiple mailings by the said defendants across state lines to the state and the bankruptcy courts and respective parties and their attorneys have caused substantial damage to the Loricks. These deceptive acts of defendants of started in 2012 and continued unabated until 2018, as by then they had fully exhausted the Loricks of any monetary value saved in the equity of the sold Real Property.

**SECOND CLAIM FOR RELIEF**
**(Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))**
**(Against All RICO Defendants)**

60.     The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

61.     The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

62.     The RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was

necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962( c ), in violation of 18 U .S.C. § 1962( d).

63.     Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

64.     Each RICO Defendants knew about and agreed to facilitate the Enterprise's scheme to obtain property from the Loricks. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in the foregoing paragraphs.

65.     The RICO defendants conspiracy took shape upon and by unilateral declaration of the default of the Loan by the defendants, Jain, Church, Waterstone, Berkaida in 2012 and in furtherance of the conspiracy to achieve the unlawful results by involving Kilpatrick and its attorneys in 2013 to achieve the desired results. The defendants coordinated their scheme and its prosecution through emails and telephonic talk and mails,  and it concluded after the RICO members have fully realized their unlawful aims by end of the year 2018 when they shared their loot, clothed as disbursement from the bankruptcy court sale of the Real Property. Each defendant endeavored and did successfully accomplished their unlawful objective of unlawful deprivation of the Loricks' Real Property, its equity.

66.     As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § l 962(d), the Loricks have been injured in its business and property, including damage to Loricks savings and investment including the massive attorneys' fees and costs associated with the auction and sale of the property in the bankruptcy court.

67.     Pursuant to 18 U.S.C. § 1964(c), the Loricks are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

### THIRD CLAIM FOR RELIEF
### (Fraud)
### (Against All Defendants)

68.     The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

69.     Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before U.S. courts and New York state court, in their communications to federal and state government agencies and officials, and in their communications to the parties including the state and bankruptcy court judges.

70.     When the defendants Wells Fargo through their servicer, Berkadia and sub-servicer Waterstone with active collusion of Kilpatrick and its legal team commenced the foreclosure action on January 30, 2013,  they misrepresented to the state court and the borrowers that the loan had been accelerated. When in fact the borrowers, the Loricks, had renewed their loan term by complying with all the terms of the signed mortgage note.

71. When the same defendants moved the state court for judgment, they concealed the facts of initial loan renewal and additional payments of $207,484.68 from the Loricks, which they had received. The defendants made a fraudulent misrepresentation of the real debt amount.

72. The defendants servicers, Berkadia and Waterstone and its CEO Mr. Church with the assistance of Kilpatrick and its legal team filed a false Proof of Claim with the bankruptcy court claims registry without giving a proper credit about the monies received ($207,484.68), thus negatively impacting substantively the debt amount increased at the default interest rate.

73. The defendants knew that the amount of monies demanded to be paid by asserting it with the Proof of Claim was actually a false figure. And even when they were reminded about the said additional payment of $207,484.68, they fraudulently suppressed the same by hiding behind the state court judgment which they knew did not properly reflected the amounts owed.

74. Each and every Defendant has personally engaged in this conduct or knew or should have known that other Defendants were engaged in it on his or her behalf. These false representations are detailed throughout this Complaint and include the falsified claim of default, indebtedness, claims and proposed judgment amounts.

75. Defendants made these false representations while knowing that their misrepresentations were materially false and/or that their omissions were material.

76. Defendants further made these misrepresentations and/or omissions with the intent of obtaining favorable rulings from the U.S. and state court.

77.     These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by parties, even the Loricks sometimes, the U.S. courts, state courts and federal government agency, U.S. Trustee Office, by means of its acceptance of Defendants' misrepresentations and omissions and its failure to take meaningful corrective action.

78.     As a direct, proximate, and foreseeable result of Defendants' fraud, the Loricks have been harmed, including significant pecuniary, reputational, and other damages. These injuries include completely wiping away the Loricks lifelong savings and the massive attorneys' fees and costs incurred in the bankruptcy court

79.      Defendants have engaged in the ill-motived, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, the Loricks is entitled to, and should be awarded, punitive damages against each of the Defendants.

80.     The Loricks are damaged by the Defendants' breach in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**
**(Against All Defendants)**

81.     The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

82.     The Loricks under the impression that they are on a loan renewal term of 5 years continued to make mortgage payments. They made more than $207,484.68. That payments were no-where credited in any pleading or judgment or claim.

83.     The Defendants sought and obtained more than 5.5 million by virtue of fraudulent obtained judgment in the state court. The Defendants have been unjustly

enriched by benefits obtained due to the disbursement from the bankruptcy court, which was based on fraudulent and misrepresented numbers.

84.     As a direct and proximate result of the Defendants' wrongful conduct, all the Defendants are liable to the Loricks for the amount of the monetary benefits conferred upon the Defendants, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

85.     The Defendants should be compelled to disgorge all unlawful, inequitable and unjust proceeds received and/or realized as a result of their wrongful conduct.

**FIFTH CLAIM FOR RELIEF**
**(BREACH OF CONTRACT)**
**(Against Fargo, Berkadia, Church, Jain, Waterstone)**

86.     The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

87.     The Loricks performed and complied with its obligations under the contract dated September 13, 2005 binding the defendants, by making regular mortgage payments and renewing timely the term renewal of the loan in 2012 for additional fiver years  by complying with its terms. The Loricks fulfilled their part of the obligation and conditions precedents, however the said defendants failed to honor their obligation.

88.     The said Defendants breached their agreement by not renewing the loan terms as called for in the properly executed contract.

89.     The Loricks are damaged by the Defendants' breach in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**(Violations of New York Judiciary Law§ 487)**
**(Against Defendants Bernardino, Brendofino and Kilpatrick)**

90.     The Loricks realleges and incorporates herein by reference each and every

foregoing paragraph of this Complaint as if set forth in full.

91.      New York Judiciary Law§ 487 provides, in pertinent part, as follows: "An

attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to

any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of

a misdemeanor, and in addition to the punishment prescribed therefore by the penal

law, he forfeits to the party injured treble damages, to be recovered in a civil

action."

92.     As set forth above, Bernardino, Brandofino and Kilpatrick engaged

in an intentional pattern of collusion, wrongdoing, and deceit with the intent to

deceive both the Loricks, the state court, the bankruptcy court including the United

States District Court for the Eastern District of New York and the United States

Court of Appeals for the Second Circuit. The defendant attorneys initially obtained

a judgment by misleading the state court about the true facts of the loan term

renewal, expanding the liability of the debt by not considering the amount of

additional monies paid after the loan renewal, filing false proof of claim and

asserting wrong claims with full knowledge that the amount of judgment debt was

based on false numbers and that the underlying judgment was obtained on false

pretense, hiding true facts and improperly exercising the default. The details have

been laid out in the preceding paragraphs of the Complaint.

93.     The attorney defendants not only misled the state and bankruptcy court they

misled the Loricks too by demanding an egregious amount exceeding $500,000 in

attorney fees and other charges when the Loricks had arranged for financing to pay off the mortgage on  the  Real Property.  The defendants knew that the demanded legal fees etc. was not the correct amount owed in legal fees and that the said sum was extortionist and it was made to deter the Loricks from redeeming the mortgage.

94.     The attorney defendants made a demand for attorneys fees at a rate exceeding $700 an hour from the bankruptcy estate, pursuant to the various provisions of the bankruptcy code, claiming that it was the rate that they were billing their client the servicers, Berkadia and Waterstone. Upon information and belief this was false and the real rate of billing or the agreement with the said clients was way below than the demanded rates.

95.     As a result of the deceitful and fraudulent conduct of these Defendant attorneys as described herein, the Loricks have been injured in an amount to be established at trial.

96.     By reason of the foregoing, the Loricks are entitled to monetary damages against the attorney defendants and the law firm, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law § 487.

**SEVENTH CLAIM FOR RELIEF**
**(PROMISE CAUSING DETRIMENTAL RELIANCE)**
**(Against Fargo, Berkadia, Church, Jain, Waterstone)**

97.     The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

98.     The defendants by virtue of a mortgage note agreement had granted an option to the Loricks to renew the loan term by an additional five years, thus extending the loan maturity time from October 2012 to October 2017.

99.    The Loricks relied on that promise and did not seek funding to pay off the mortgage or get a new loan from another lender, as they were under the impression (further told by Berkadia) that the loan was all set to renewal. The Loricks had no reason to not to believe, otherwise.

100.    This reliance by the Loricks upon the contract and assurance from the servicer, Berkadia was reasonable and foreseeable.

101.    However, without any warning, the said Defendants breached that agreement and the Loricks could not immediately arrange for the funds to pay off the funds before the  loan was demanded in full. As a result of the foregoing, the Loricks suffered severe financial damages in an amount to be amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR**
**DEALING**
**(Against all Defendants)**

102.    The Loricks realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

103.    There was implied in the Agreement [Consolidated Note and Mortgage] between lender Independence  and the Loricks and related loan documents, a covenant of good faith and fair dealing whereby Lender impliedly [or any other party taking over the Note or servicing] covenanted that it would in good faith and in the exercise of fair dealing deal with the Loricks fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Loricks rights.

104.   As alleged herein, the Defendants breached the covenant by its acts, including but not limited to, any of the acts set forth above, to the extent that such acts may be deemed not to be express breaches of contract, and, in addition:

a.   Failing to give notice and time prior to taking unilateral action;

b.   Changing unilaterally the loan maturity date from the year 2017 to 2012, as a pretext to declare a default;

d.   Failing to consider and/or negotiate in good faith with regard to the extension as had been promised and when brought to the attention of the foreclosing parties;

e.   Promising to provide an opportunity to pay off the unpaid balance only to make it conditional upon payment of additional extortionist legal fees of $500,000;

f.   Imposing improper fees and charges based on a nonexistent default;

g.   Evading the spirit of the bargain which Lender had made with the Loricks:

h.   Failing to cooperate with the Loricks' performance pursuant to the Agreement between the parties and taking action which prevented the Loricks performance under the Agreement;

i.   Conjuring up false and onerous legal fees demands as excuses for theirs refusal to perform;

j.   Abusing its power to determine compliance with the Agreement;

k.   Abusing its power to determine and impose fees and charges on the account;

l.   Filing a Notice of Default when its own conduct created the purported default;

m.   Filing fraudulent claims in the state and bankruptcy courts;

n.   Not giving credit to the payments that were made, rather deliberating concealing their payments from the claims in the state and bankruptcy court;

o.   Not correcting their claims despite having brought to their notice that they have improperly collecting more monies than was due or obliged.

p.   Otherwise failing to do everything the Agreements presupposed Lender would do to accomplish their purpose;

q.   Engaging in deceit and untruthfulness regarding its intention to avoid performance of its obligations under the Agreement and cannibalize performing assets in its portfolio to a nonperforming asset solely to reap more benefits in terms of charging legal fees and default interest rate;

r.   By inequitably holding more than $95,773 in escrow reserve when the same could have been applied to the reduction of the principal; and

s.   By improperly charging late charges exceeding $100,056.38 when they were not entitled to charge after the alleged acceleration of the loan amount.

85.   The Loricks had performed all conditions, covenants and promises required by it on its part to be performed in accordance with the terms and conditions of the agreements, except for those it was prevented from performing or which were waived or excused by Lender's misconduct.

41

105.   As a proximate result of the Defendants breach of agreement, the Loricks have been damaged in an amount to be proven at trial.

Wherefore, the Loricks prays for judgment as set forth below.

### PRAYER FOR RELIEF

**On the First and Second Claims for Relief:**

l.      For general damages, according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c).

2.      For the Loricks' reasonable attorneys' fees and costs according to the statute, 18 U.S.C. § 1964(c).

**On Third, Fourth and Fifth Claims for Relief**

3.      For general and punitive damages in an amount to be proven at trial.

**On Sixth Claim for Relief**

4.      For general damages, according to proof at trial, trebled according to statute, Judiciary Law§ 487;

5.      For the Loricks reasonable attorneys' fees and costs according to statute, Judiciary Law § 487.

**On Seventh and Eight Claim for Relief**

6.      For general and punitive damages in an amount to be proven at trial.

**As to All Causes of Action:**

7.      For such other legal and equitable relief as the Court may deem the Loricks are entitled to receive.


Dated: May 11, 2020
New York NY

**Dahiya Law Offices, LLC**
B*y: karamvirdahiya*
Karamvir Dahiya

75 Maiden Lane Suite 506
New York NY 10038
Tel: 212 766 8000
karam@dahiya.law
